IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| James E. Damron, *et al.*, | : | |
| Plaintiffs, | : | Civil Action 2:09-cv-050 |
| v. | : | Judge Marbley |
| Wanza Jackson, | : | Magistrate Judge Abel |
| Defendant | : | |

**OPINION AND ORDER**

On January 3, 2011, the Court entered an order deeming Plaintiffs' September 8, 2010 objections (Doc. 269) to the August 20, 2010 Report and Recommendation of the Magistrate Judge to be a new motion for summary judgment, and ordering Defendant to reply. This matter is now before the Court pursuant to this motion for summary judgment, as well as Defendant's own June 1, 2011 cross-motion for summary judgment (Doc. 316).

**Factual background**. The Court has repeatedly set forth the factual background of this matter. Plaintiffs are a group of inmates incarcerated in the Ohio penal system who adhere to the Christian Separatist Church. Defendant is the Religious Services Director of the Ohio Department of Rehabilitation and Correction. In their original complaint, Plaintiffs alleged violation of their constitutional right to free exercise of religion pursuant to 42 U.S.C. §1983 and 42

1

U.S.C. §2000cc, due to what they asserted was Defendant's failure to:

> (1) permit work proscription on Christian Sabbath; (2) failure to permit observance of religious Holy Days and Feast Days (Pentecost, Resurrection Sunday, Passover, and Day of Vindication); (3) Separate worship and study for adherents of Christian Separatist Church apart from non-whites and homosexuals; (4) Cell separation from non-whites and homosexuals; (5) That Christian Separatist religious literature be permitted within the institutions under the Least Restrictive Means mandated by the Religious Land Use and Institutionalized Persons Act (RLUIPA, 42 U.S.C. § 2000cc); (5) That institution Chapel and Library make Christian Separatist religious books and literature available on basis similar to availability of religious literature for mainstream Christian, Muslims and Jews.

(Doc. 1-2 at 2.) This case has a long procedural history, and Plaintiffs have repeatedly moved for summary judgment or partial summary judgment. The Court has previously denied these in every instance, on grounds that Plaintiffs failed to present sufficient factual detail to present a controversy which the Court could resolve. *See* Docs. 141, 279, 286. As noted above, however, the Court later found Plaintiffs' Objections of September 8, 2010 to contain sufficient detail to articulate claims for unlawful denial of religious accommodations, and deemed this brief the new motion for summary judgment which is now at bar.[1] In addition, on June 1, 2011, Defendant filed her own motion for summary judgment on all of Plaintiffs' claims.

**Summary judgment**. Summary judgment is appropriate "if the pleadings,

---

[1] Defendant has pointed out, correctly, that the motion for summary judgment contains only allegations of injuries suffered by Plaintiff James E. Damron ("Damron"). Although the motion was signed by multiple plaintiffs, the Court accordingly considers it to have been filed on behalf of Plaintiff Damron alone, and will address Plaintiffs' claims only with respect to Damron.

2

the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (concluding that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations [...] but [...] must set forth specific facts showing that there is a genuine issue for

3

trial." Fed. R. Civ. P. 56(e); *see Celotex*, 477 U.S. at 324. Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Matsushita*, 475 U.S. at 587-88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

Inmates' First Amendment rights. Under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUPA"), 42 U.S.C. §2000cc-1, a government may not impose a "substantial burden on the religious exercise" of an inmate, unless the government demonstrates that imposition of such burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means" of furthering that interest. The purpose of RLUPA is to "protect[] institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent upon the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005). In determining whether a practice is the "least restrictive means" of furthering a compelling government interest relating to the incarceration of prisoners, a court must give due deference to the judgment of prison officials as to the safety concerns implicated by prison regulations. *Hoevenaar v. Lazaroff*, 422 F.3d 366, 370 (6th Cir. 2005). The RLUPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter*, 544 U.S. at 722.

The burden of persuasion is explicitly set forth in the statute:

> If a plaintiff produces *prima facie* evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of section 2000cc of this title, the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion.

42 U.S.C. §2000cc-2.  Moreover:

> An action of a prison official "will be classified as a substantial burden when that action forced an individual to choose between 'following the precepts of [his] religion and forfeiting benefits' or when the action in question placed 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Barhite* [*v. Caruso*], 377 Fed.Appx. [508] at 511 [(6th Cir. 2010)] (quoting *Living Water Church of God v. Charter Twp. of Meridian*, 258 Fed.Appx. 729, 734 (6th Cir.2007) (quoting *Sherbert v. Verner*, 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 717–18, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981))).

*Hayes v. Tennessee*, 424 Fed.Appx. 546, 554-55 (6th Cir. 2011).  RLUPA's "least restrictive means of furthering a compelling government interest" standard is less deferential than the "reasonable relation to legitimate penological interests" standard typically applied to religious exercise First Amendment claims.  *Cutter*, 544 U.S. at 712.

<u>Denial of access to religious literature</u>.  In his motion for summary judgment and the accompanying affidavit, Damron identifies six incidents in which material pertaining to his faith was allegedly withheld or confiscated by prison authorities:

1. On May 21, 2007, the religious literature "The Apocalypse of Jesus Christ", "Separatist Brief, Vol. 1", "ICorinthians on CD", and "IICorinthians on CD" arrived at the mail room at Damron's institution.  A corrections officer on duty forwarded these on for screening, whereupon they were misplaced by staff.  A year later,

5

        Plaintiff was reimbursed $73.00 for the missing materials.

2. On October 27, 2007, Damron received a Notice of Withholding Printed Material with respect to "Positive Christianity in the Third Reich".

3. On October 2, 2008, Damron received a Notice of Withholding Printed Material with respect to a boxed set of four CDs from the Christian Separatist Church Society.

4. On June 25, 2008, Damron received a Notice of Withholding Printed Material with respect to Mein Kampf.

5. On January 8, 2009, while Damron was at Lebanon Correctional Institution, a corrections officer inspected his cell and seized "The Real Hitler" and "The Holy Roman Empire". The material was returned to him "shortly afterward" by a case manager, although Damron alleges he was verbally abused by the corrections officer.

6. On September 24, 2009, "Charter for Prison Chapters and Prisoner Participation in the C.S.C.", "Basic Background Tenets of Separatist Beliefs", "Scriptural Evidence at the Bible Teaches Racial Separatism for the Race of Adam and His Adamic Children, Heirs of Promise", "Biblical Words with Racial Overtones and Implications in Greek", and "[s]elect parts of ODRC Handbook on Religions provided to me as discovery evidence by the State of Ohio" were withheld from Damron by a prison chaplain and corrections officer.

(Doc. 269 at 14-16.) Plaintiff's motion is also accompanied by numerous exhibits, which he identifies as the relevant Notices of Withholding Printed Material and other related correspondence.[2]

---

[2] Defendant argues that these materials, which Damron identifies in his affidavit, constitute inadmissible hearsay evidence, but does not further develop this assertion. It is not readily apparent that these materials, which consist almost entirely of form Notices of Withholding Printed Material, Notifications of Grievances, Informal Complaint Resolutions, and the like, should be excluded from evidence. *See* Exhibits to Doc. 269. Furthermore, Defendant's motion for summary judgment was accompanied by virtually the same documents. *See* Doc. 316-1 at 9-18.

Plaintiff specifically states that, with respect to the first set of materials, he was eventually reimbursed for the loss.  He argues instead that the handling of his mail was "negligent" and was related to the infringement of his religious exercise.  However, Plaintiff attached to his affidavit a signed and executed "Release of Claim" in which, in exchange for the $73.00 reimbursement, Plaintiff agreed to release and hold harmless all state employees from any claim whatsoever arising out of the incident. (Doc. 269-3 at 6.)  Plaintiff has not argued that he was coerced or defrauded in any way in his execution of this release.  Accordingly, his claim here is barred with respect to these materials.  Furthermore, Damron wrote on the "Notice of Withholding Printed Material" relating to the October 2, 2008 withholding of the boxed set of four CDs a request, not to appeal the withholding decision, but to mail the CDs to Wendy L. Damron instead at his expense. (Doc. 269-2 at 3.)  This likewise does not give rise to a claim relating to ODRC's screening policies, and is not an incident for which Plaintiff exhausted his administrative remedies.

Plaintiff also claims, with respect to the copy of Mein Kampf he alleges that he ordered, that after the book was withheld by mail room staff, he "still [has] not heard anything on this history book", and alleges that this is a deliberate infringement upon his religious exercise.  One exhibit to Plaintiff's motion is a June 25, 2008 "Notice of Withholding Printed Material", in which a corrections officer who identified himself as "D. Kraft" excluded printed material identified as "Mein Kamph" on grounds that it depicted the use of physical violence. (Doc. 269-2 at 1.)

On this form, Damron requested review of the decision by the Screening Committee.[3] However, Plaintiff presents no evidence from which a reasonable finder of fact could conclude that Officer Kraft, or the Screening Committee, deliberately confiscated his book in order to infringe upon his free exercise of religion, instead of simply losing it as with his earlier materials.

In addition, with respect to the alleged January 8, 2009 seizure of "The Real Hitler" and "The Holy Roman Empire", Plaintiff alleges only that an Officer Moore seized the materials and that they were "given back to me shortly afterward from case manager, Mr. Johnson". (Doc. 269 at 15.) These materials were thus not screened by ODRC under any standard, constitutional or otherwise, and their brief confiscation was *de minimis*. Plaintiff does not allege that Defendant (or her predecessor in office) had anything to do with this incident, and has not named Officer Moore as a defendant in this action.

Plaintiff's religious literature screening claims thus arise out of the materials which actually were screened. Defendant's motion for summary judgment is accompanied by an affidavit from Austin Stout, Assistant Chief Counsel to the Ohio Department of Rehabilitation and Correction ("ODRC"). In his affidavit, Stout stated that one of his duties is to serve on ODRC's Central Office Publication Screening Committee, the body established by Ohio Administrative Code §5120-9-

---

[3] Defendant's affiant, Austin Stout, asserts that the Screening Committee database has no record of this publication ever having been reviewed by the Screening Committee. (Doc. 316-1 at 5.)

19 to which inmates can appeal a warden's decision to exclude a certain piece of literature. (Doc. 316-1.) §5120-9-19 provides, in relevant part:

> (C) Printable material is excludable if it is deemed to be detrimental to, or to pose a threat to the rehabilitation of inmates; the security of the institution; or, the good order or discipline of the institution. Examples of such material include, but are not limited to printed material:
> [...]
>
> (2) Which depicts, encourages, incites, or describes activities which may lead to, the use of physical violence against others.

Stating that he had reviewed the Publication Screening Committee's database, Stout testified:

> • The Screening Committee affirmed the decision to withhold "Positive Christianity in the Third Reich" because the "images, symbols and references within the publication promote white supremacy and Nazism, which is associated with a known Security Threat Group ["STG"]... the promotion of white supremacy and Nazism within the prison setting is contrary to the fundamental interests of society and prison security and will likely lead to violence." (Doc. 316-1 at 3.)
>
> • The Screening Committee affirmed the decision to withhold "Christian Separatist Church – Charter for Prison Chapters and Prisoner Participation" because it "incites hatred and violence based on race, and is associated with a known STG, which is contrary to the fundamental interests of society and prison security". (*Id.*)

Plaintiff has not specifically rebutted the findings of the Screening Committee or the statements in Stout's affidavit concerning the nature or content of these materials. In his memorandum contra, however, Plaintiff argues that depriving him of these works places a substantial burden upon his exercise of religion, because their absence deprives him of a proper understanding of the tenets of his faith and implicitly places pressure upon him to modify his behavior and

violate those beliefs. (Doc. 319 at 12-13.)

This Court has previously rejected generalized bans on religious material on grounds that they promote racial hatred. In *Mann v. Wilkinson*, 2007 WL 4562634 (S.D. Ohio 2007), it addressed an inmate's right to possess a pamphlet explaining the belief system of the Christian Identity Church, which, similarly to the materials at issue here, expounded opposition to racial mixing and homosexuality:

> The Court begins its analysis by echoing another court's observation about the difficult nature of the issues posed to prison officials when they receive a request for religious expression which implicates prison security concerns. "Anyone familiar with prisons understands the seriousness of the problems caused by prison gangs that are fueled by actively virulent racism and religious bigotry. Protecting staff from prisoners and prisoners from each other is a constant challenge." *Stefanow v. McFadden*, 103 F.3d 1466, 1472 (9th Cir.1996), *recognized as superseded by statute on other grounds in Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024 (9th Cir.2007). Nevertheless, it is inconsistent with both the letter and spirit of RLUIPA (or its precedessor, the Religious Freedom Restoration Act) to permit concerns about prison security to trump every request by a prison inmate to receive or view religious literature that has racist or homophobic overtones. Rather, if publications which are genuinely religious in nature do "not counsel violence [and] there is no evidence that they have ever caused a disruption" in the prison setting, the fact that "the views expressed in the publications are racist and separatist" cannot by itself justify an absolute ban on such publications. *Williams v. Brimeyer*, 116 F.3d 351, 354 (8th Cir.1997). An absolute ban on religious publications should ordinarily be limited to those which "promote violence to exalt the status of whites and demean other races...." *Borzych v. Frank*, 439 F.3d 388, 391 (7th Cir.2006).
>
> In this case, the defendants have attempted to justify their ban on the Christian Identity pamphlet because it is racist, and because there is a history of racial violence within the SOCF. However, they have provided no proof that such racial violence was connected in any way to White separatist religious groups such as the Christian Identity Church, the Christian Separatist Church, or the Church of Jesus Christ Christian, all of which appear to have similar beliefs concerning

> the biblical supremacy of the White race. They have similarly provided no evidence from which the trier of fact could conclude that literature relating to such separatists groups has itself been a cause of violence within the SOCF or any other institution or that such literature has been used to promote membership in racially-segregated gangs which, in turn, may have been responsible for acts of violence within any Ohio prison. At least one court has concluded that the absence of such facts precludes an entry of summary judgment in favor of prison officials under very similar circumstances: "[S]ummary judgment would be appropriate only if [the defendants] presented some specific evidence, why this particular item implicates prison concerns." *Murphy v. Missouri Dep't. of Corr.*, 372 F.3d 979, 986 (8th Cir.2004).

Most courts have analyzed this issue in terms of whether prison officials are able to demonstrate, in a fashion not reasonably subject to dispute, that a particular piece of literature advocates not only separation of the races or supremacy of one race over another, but also violent acts in order to promote a racially separatist agenda. As the court in *McCabe v. Arave*, 827 F.2d 634, 638 (9th Cir.1987) pointed out, "literature advocating racial purity, but not advocating violence or illegal activity as a means of achieving this goal, and not so racially inflammatory as to be reasonably likely to cause violence at the prison, cannot be constitutionally banned...." That case, decided well before the enactment of either RLUIPA or RFRA, noted that "[c]ourts have repeatedly held that prisons may not ban all religious literature that reflects racism." *Id*. In fact, even under the more lenient standard followed by federal courts after the Supreme Court's *Turner v. Safley* decision (*see* 482 U.S. 78 (1987)), courts have struck down bans on separatist literature such as that put out by the Church of Jesus Christ Christian. *See Nichols v. Nix*, 810 F.Supp. 1448 (S.D.Iowa 1993). Obviously, if a prison cannot justify such a ban under the more lenient *Turner* standard, which requires only that the ban reasonably be related to a legitimate penological interest, such a ban could not withstand scrutiny under RLUIPA.

*Mann*, 2007 WL 4562634 at *5-6. The Court concluded in *Mann* that "the reasons given by the defendants in their declarations and affidavits are simply too conclusory to require a finding that, as a matter of law, the prison's undoubtedly compelling interest in security can be furthered only by a complete ban on this particular piece of religious literature." *Id*. at *6. Noting that there was no evidence that the plaintiff was amongst a group of similar adherents who used such

11

materials to incite members to acts of violence, or that he himself had ever used such materials to incite or promote violence or to enlist persons in a gang, the Court found that a "myriad of factual disputes" existed as to whether the total ban on such materials was consistent with RLUIPA. The Court reaches the same conclusion here. It is presented with Stout's affidavit, which assures in general terms that the withheld materials promote imagery or beliefs "associated with" a known prison gang, and that their promotion of white supremacy or racial hatred "is contrary to the fundamental interests of society and prison security." Defendant has identified no more specific information, such as quotations from these materials calling for violence or records of incidents involving Damron (or any other person) employing such materials to promote violence or gang affiliation. The Court cannot say that no genuine issue of material fact exists as to whether the deprivation of these materials represents a substantial burden upon Plaintiff's exercise of his religion, or whether Defendant has employed the "least restrictive means" of furthering ODRC's legitimate interests in prison security. Summary judgment is thus not appropriate on this claim. Likewise, summary judgment is not appropriate on Plaintiff's claim for equal availability of Christian Separatist literature in the prison chapel and library.

  **Denial of work proscriptions**. Plaintiffs have repeatedly asserted that they requested work proscription on "(1) Passover; (2) Resurrection Sunday; (3) Pentecost; and, (4) Day of Vindication", as well as the "Christian Sabbath". (Doc. 319 at 14.) The Magistrate Judge previously warned, in a Report and

Recommendation on one earlier motion for summary judgment:

> However, Plaintiffs again, despite having generally pled that each was denied a religious accommodation request, do not specifically allege that any particular plaintiff was forced to work on any particular Sabbath. As Plaintiffs merely complain generally about the ODRC's policies, rather than alleging that they have ever actually been injured by them or denied some specific exercise of their religious rights, the Court cannot grant Plaintiffs summary judgment on this claim.

(Doc. 94 at 6.) Likewise, the Magistrate Judge again cautioned Plaintiffs in a Report and Recommendation on a subsequent motion for summary judgment:

> Again, however, plaintiffs have presented nothing but a statement that they are entitled to such proscriptions, and an assertion that Defendant continues to "refuse this right to inmates under his jurisdiction." None of Plaintiffs' exhibits appear to relate to the denial of work proscriptions. Their motion again does not state which of the Plaintiffs were denied such proscriptions, or when, or what jobs they work for which they require proscriptions. Without this information, the Plaintiffs have not presented a controversy for the Court to resolve.

(Doc. 261 at 5.) In the most recent motion for summary judgment, Plaintiff Damron again generally refers to having been denied a religious work proscription, and describes the importance of the Sabbath to his religion. However, he has not offered any specific explanation as to how the denial of work proscriptions has infringed upon his, or any other plaintiff's, ability to pursue his religious faith.[4] He has also not offered any response to the religious services administrator's original denial of work proscription on grounds that "as a 'Porter 4' you do not have a job assignment

---

[4] In his brief, Plaintiff asserts, with respect to the Sabbath, that "every day is a Sabbath day... not just one day a week", and with respect to holy days, that "Christian Separatists do commemorate certain days of the year, but not with a ritualistic observance, but with an appreciation and remembrance of the meaning of" the day. (Doc. 319 at 14.)

13

that would conflict with your request to abstain from work on the Sabbath." (Doc. 72-1 at 1.) Despite repeated direction from the Court to put before it a justiciable controversy, Plaintiff has failed to do so. In the absence of such a controversy, the Court cannot grant relief. Summary judgment is thus appropriate on this claim. *See also Grigsby v. Sims*, 2006 WL 2345124 at *7 (S.D. Ohio 2006) (defendant entitled to summary judgment where plaintiff failed to allege facts or evidence that states he was unable to observe his Sabbath).

**Segregated worship**. In her motion for summary judgment, Defendant suggested that Plaintiff has not suffered a substantial burden upon his religious practice, because, despite being denied certain accommodations, he could still: (1) visit individually with a minister during normal prison visiting hours; (2) receive religious publications which do not incite violence; (3) engage in individual prayer, study, and reflection; and (4) engage in congregational worship with Protestants. (Doc. 316 at 6.) Plaintiff argues that these proposed alternatives are inadequate; with respect to segregated worship, he rebuts specifically that there is no Christian Separatist minister in Ohio who could visit him, that the opportunity for individual prayer is tautological and meaningless, and that the tenets of Christian Separatism are fundamentally incompatible with those of ordinary Protestant denominations, which Plaintiff characterizes as unacceptably "Judeo" Christian beliefs. (Doc. 319 at 12.)

"The State does not have an affirmative duty to provide every prison inmate with... the [religious] service of his choice..." *Small v. Lehman*, 98 F.3d 762, 767

14

(3rd Cir. 1996), *overruled on other grounds by Boerne v. Flores*, 521 U.S. 507 (1997). In *Mann*, *supra*, the Court found that the plaintiff had not made an adequate showing that denying him the opportunity to attend separate Christian Identity worship services substantially burdened his exercise of that religion. *Id.* at *4. It based this conclusion in part on the fact that the plaintiff had not explained why congregate worship was mandated by his faith. The Court finds similar circumstances here. Plaintiff has explained at length why being exposed to Protestant services would be "obnoxious... unacceptable at every level", but has made no showing, other than a bare reference to a "congregate obligation", that Christian Separatism requires him to participate in congregate worship at all. A purported burden upon a person's religious exercise "must be substantial and an interference with a tenet or belief that is central to religious doctrine." *Bruton v. McGinnis*, 110 F.3d 63 at *2 (6th Cir. 1997), quoting *Stefanow v. McFadden*, 103 F.3d 1466 at *1 (9th Cir. 1996). *See also Weir v. Nix*, 114 F.3d 817 (8th Cir. 1997); *Hoevernaar v. Lazaroff*, 422 F.3d 366 (6th Cir. 2005). Plaintiff thus has not made a *prima facie* showing of a substantial burden upon his ability to practice his chosen religion, and summary judgment is appropriately granted under RLUIPA.

**Segregated celling**. In his initial complaint, Plaintiff argued that his church "advocates racial separation based upon biblical interpretation", and that the ODRC accordingly infringes upon his religious exercise in not granting "racial cell separations apart from non-whites and homosexuals in accordance" with these beliefs. (Doc. 1-2 at 3) Defendant argues on summary judgment that no court has

15

ever found that prisoners are entitled to racial separation in celling on the basis of religion, that ODRC policy mandating racial integration in celling furthers penological objectives such as limiting the managerial resources expended in keeping track of which inmates demanded racial separation and applying prison policies to all inmates in a uniform fashion, and that it would be impossible to comply with Plaintiff's demands as ODRC does not maintain records of which inmates are homosexual and cannot realistically make such a determination.  In response, Plaintiff refers only briefly to the tenets of his religion, but suggests instead that the mixing of races would put Christian Separatist members in physical danger and reiterated again that his religious freedoms should not be infringed.  The Court finds that Plaintiff has again failed to make a *prima facie* showing that the failure to grant him a religious dispensation to not be celled with non-whites or homosexuals is a substantial burden on his ability to practice his religion.  Summary judgment is appropriately granted under RLUPA.

**Similar treatment, availability of damages, and federal funds**.  Plaintiff requests that the ODRC cease treating Christian Separatists differently from followers of other religions.  He alleges that other faith groups such as the Nation of Islam profess racial separation and/or supremacy (Doc. 319 at 10), and claims that ODRC does not discriminate against these.  Nevertheless, this claim amounts to little more than the "unadorned, the-defendant-unlawfully-harmed me accusation" barred by *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).  Plaintiff's other claims identify specific privileges which he claims he is being denied or specific harmful

16

actions which the ODRC has taken. This blanket allegation of unfairness, however, does not of itself offer "a short and plain statement of the claim showing that the pleader is entitled to relief". Fed. R. Civ. P. 8(a)(2). It is properly dismissed for failure to state a claim.

Plaintiff concedes that his claims fail to meet the requirement of the Prison Litigation Reform Act, 42 U.S.C. §1997e(e) that he show "physical injury" in order to recover for emotional or mental injury, and that monetary damages are not available to him under RLUIPA. (Doc. 319 at 22.) *See Sossamon v. Texas*, 131 S.Ct. 1651 (2011). It is accordingly unnecessary to address Defendant's claim of qualified immunity.

Finally, in Plaintiff's complaint he sought an order "[t]hat Defendant and ODR&C cease obtaining Federal funds for refusal to abide by mandates of RLUIPA". (Doc. 1-2 at 5.) Defendant states, correctly, that statutes relating to the Spending Clause can only impose liability upon the actual recipient of federal funds, not an employee of such recipient. Sole defendant Wanza Jackson is such an employee, and thus is not properly a defendant to such an action. *See, e.g., Buchanan v. City of Bolivar*, 99 F.3d 1352, 1356 (6th Cir. 1996). Defendant is accordingly entitled to summary judgment on this claim.

**Conclusions**. For the reasons set forth herein, the Court finds that genuine issues of material fact exist with respect to whether the withholding of certain publications from Plaintiff James Damron constitutes a substantial burden to the exercise of his religious faith and whether such withholding is the least restrictive

17

means of furthering ODRC's legitimate interests in prison security.  However, Defendant is entitled to summary judgment on all other claims.  Accordingly, Plaintiff's motion for summary judgment (Doc. 269) is **DENIED**, and Defendant's motion for summary judgment (Doc. 316) is **GRANTED IN PART** and **DENIED IN PART**.

As the Court stated above, Plaintiff's motion for summary judgment, although it was signed by all plaintiffs, contains only allegations of injuries suffered by Plaintiff James E. Damron.  All claims pertaining to practitioners of the Christian Separatist Church in general have been dismissed.  No plaintiff other than Damron has presented, in response to Defendant's motion for summary judgment, evidence of any injury underlying their claims.  Accordingly, as no claims brought by plaintiffs other than James E. Damron remain in this action, all plaintiffs aside from James E. Damron are **DISMISSED**.

Furthermore, Plaintiff has filed a motion to compel Defendant's responses to certain interrogatories (Doc. 283).  It appears that almost all the topics addressed in Plaintiff's interrogatories have been rendered moot by the instant opinion.  Furthermore, on September 8, 2011, Defendant filed a notice stating that she had served responses to Plaintiff's interrogatories on June 10, 2011.  Plaintiff's memorandum contra summary judgment, which postdates this discovery response,

does not address any continuing deficiencies of discovery.  Accordingly, the Court concludes that the motion to compel (Doc. 283) is now **MOOT**.

s/Algenon L. Marbley<br>
United States District Judge